No. 43,155
STATE OF KANSAS, *Appellee,* v. WILLIAM NAY WOOD, *Appellant.*
(378 P. 2d 536)

Opinion filed January 26, 1963.

*William Nay Wood,* appellant, was on the brief, *pro se.*

*Brock R. McPherson,* Assistant County Attorney, argued the cause, and *William M. Ferguson,* Attorney General, and *Larry E. Keenan,* County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a criminal action in which the appellant was tried and convicted on five felony counts as follows: (1) Burglary in the second degree of the Dr. Pepper Bottling Company, Great Bend, Kansas; (2) grand larceny of a typewriter, check protector and printed checks from said Dr. Pepper Bottling Company; (3) forgery of a check on said Dr. Pepper Bottling Company in the sum of $113.20; (4) uttering to C. O. Mammel Food Store, Ellinwood, Kansas, the forged instrument described in count No. 3; and (5) uttering to H & H I. G. A. Grocery Store, Ellinwood, Kansas, the forged instrument described in count No. 3. Originally the information contained a sixth count alleging forgery of a check on the Dr. Pepper Bottling Company in the sum of $94.15, but this count was dismissed by the prosecution prior to submission of the case to the jury.

Appeal has been duly perfected from a judgment sentencing the appellant under the habitual criminal act on each of said counts to the state penitentiary for a term of thirty years, said sentences to run concurrently.

The primary question presented is whether evidence introduced at the trial was obtained by an illegal search and seizure, and thus subject to the exclusionary rule. Other trial errors are also specified.

At the preliminary hearing on January 15, 1962, the appellant was represented by Lloyd H. Phillips, a practicing attorney in Great Bend, Kansas, who later was appointed to represent him at the trial of this action in the district court.

The material portion of the state's evidence was, in substance, as follows:

Between the hours of approximately 5:00 p. m. on December 29, 1961, and 8:45 a. m. on December 30, 1961, the offices of the Dr. Pepper Bottling Company located at 1209 Kansas Avenue, Great Bend, Barton County, Kansas, were burglarized. Entry apparently was gained by breaking a large window in the south room of the two rooms of the office. Missing from the office were a Remington Rand typewriter, a check protector machine, and a book of numbered checks printed with the name "Dr. Pepper Bottling Company." The numbers of the missing checks were from 241 to 400, inclusive. None of these items was returned.

The state's exhibits numbered 1, 2, 3 and 4 are part of the checks missing as a result of the burglary. The typing which appears on these exhibits and the "check protectored" parts of these exhibits, added after the burglary, appeared to be the same as the type of the missing typewriter and the impression made by the missing check protector.

William Nay Wood (defendant-appellant) had been in the office of the Dr. Pepper Bottling Company on three or four occasions prior to December 29, 1961. On November 26, 1961, he rented the apartment above the bottling company in the same building. On the 5th day of December, 1961, he moved out of this apartment. The stairway to this apartment was located on the south side of the building but to the outside. The window broken out during the burglary was right next to this stairway.

On December 7, 1961, the appellant was in the office of the Dr. Pepper Bottling Company when Mr. John B. Weltmer, manager, wrote him a check on a bottling company printed check. The check was in payment for a mirror which he purchased for the apartment. The appellant was present when the checkbook was taken from the bookkeeper's desk for the purpose of writing the check. The checkbook when it was taken during the night of December 29, 1961, was in the same location. The typewriter and check protector were also located in this room.

On December 29, 1961, at about 8:00 p. m. Ellis Wright was confined in the Great Bend, Kansas, city jail for drunkenness. At that time he loaned his automobile, a 1954 Pontiac, to the appellant. The Pontiac was a four-door, light blue with dark blue top, bearing license No. PN 3811. The automobile was loaned to the appellant for the purpose of going to Ellis Wright's brother, John, to inform him that Ellis was in jail and to tell John to make arrangements to get him out.

At about 9:30 or 10:00 p. m. on December 29, 1961, the appellant contacted John Wright at Mr. Wright's home in Great Bend and was in the 1954 Pontiac owned by Ellis Wright.

Approximately 10:15 p. m. on December 30, 1961, Ellis Wright was released. He procured his automobile from the Barton County sheriff's office during the afternoon of December 31, 1961. At that time the left tail light was broken out.

At approximately 6:30 p. m. on December 30, 1961, Jesse Wyatt went to the H & H I. G. A. Grocery Store in Ellinwood, Barton County, Kansas, to purchase two cartons of Pall Mall cigarettes

and to cash a check. He handed an employee, Dorothy Griffin, a check in the sum of $113 and some odd cents. (The state's exhibit No. 4 was on a Dr. Pepper Bottling Company check form written in the sum of $113.20, with the purported signature of John B. Weltner. It was payable to Jesse Wyatt and had a check protector used on it.) When Wyatt presented the check to the employee she referred him to the store manager, Mr. Secrist. Wyatt then presented the check to Mr. Secrist to be cashed, without success. Secrist testified the check Mr. Wyatt gave him to cash was just like the state's exhibit No. 4.

At approximately 6:35 p. m. on December 30, 1961, Jesse Wyatt entered the C. O. Mammel Food Store in Ellinwood, Barton County, Kansas. He asked the assistant manager, Mr. Bieberle, for two cartons of Pall Mall cigarettes and Wyatt handed him a check. Mr. Bieberle stated he could not cash the check and Mr. Wyatt did not buy the cigarettes. Mr. Bieberle stated the check Wyatt handed him was just like the state's exhibit No. 4.

After Wyatt left the store Mr. Bieberle sent Elmer Burgardt, one of the employees, out to get the license number. Mr. Bieberle had heard abut the checks being stolen from the Dr. Pepper Bottling Company, and he assumed this was one of them. He telephoned the Ellinwood, Kansas, police and gave them a description of the automobile just as Elmer Burgardt had given it to him; he also told the police the automobile was headed east on U. S. Highway No. 56.

Elmer Burgardt testified that on December 30, 1961, at 6:30 or 6:35 p. m. he saw Jesse Wyatt come into the Mammel Store and was told by Mr. Bieberle to secure the license number of Wyatt's automobile. Burgardt followed Wyatt out of the store to an automobile parked one-half block from the store. The automobile drove away east on U. S. Highway No. 56. Burgardt noted the automobile was a 1953 or 1954 Pontiac, two-tone blue and had the left tail light out. He was not able to see the license tag. He reported the description to Mr. Bieberle, and the direction the automobile was headed when it left.

At about 6:50 p. m. on December 30, 1961, Jesse Wyatt entered Keith's Food Market in Chase (Rice County), Kansas. He asked for two cartons of Pall Mall cigarettes and asked to cash a Dr. Pepper Bottling Company check in the amount of "ninety-some dollars." The manager, Keith Laessig, testified that the state's exhibit No. 3 was similar to the check Wyatt had, in that they both were Dr.

Pepper checks and both made out to Jesse Wyatt, as he recalled. The check was not cashed and Wyatt did not buy the cigarettes.

At about 6:30 p. m. on December 30, 1961, Jesse Wyatt entered the I. G. A. Store in Chase, Kansas. He gave Lloyd W. Garrett, manager of the store, a Dr. Pepper check in the sum of "ninety four dollars, some cents" to cash. Mr. Garrett testified the check was made payable to Jesse Earl Wyatt and was "check protectored" just like the state's exhibit No. 3. He further testified concerning exhibit No. 3 that the check presented to him to cash was one like it, although he could not identify it positively.

The sheriff of Rice County, Kansas, Paul Cline, testified that on December 30, 1961, just prior to 7:00 p. m., he received a telephone call from their radio dispatcher to the effect that the Ellinwood police had called to be on the lookout for a 1953 or 1954 two-tone blue Pontiac with the left tail light missing, which was, at last report, headed east on U. S. Highway No. 56; that an occupant of the vehicle had tried to pass a check that was reportedly taken from the burglary of the Dr. Pepper Bottling Company establishment in Great Bend, Kansas; that "they wished this car stopped and checked if we could find it."

After receiving this report Sheriff Cline drove west of Lyons, Kansas, on U. S. Highway No. 56. Approximately four miles west of Lyons he noted an older model automobile with the left tail light out traveling east toward Lyons. The sheriff turned around and followed this automobile and radioed ahead for the Lyons police to be on the lookout for it. About three-fourths of a mile west of Lyons, when he caught up with this automobile, he wrote the license number down and asked their radio operator to run a registration check on this 1961 registration, Pawnee County 3811. At the same time he asked city car No. 4, operated by Officer Samuels, who was on duty, to stand by, that he would stop the automobile right at the west edge of the city of Lyons, Kansas.

The sheriff stopped the vehicle at the west edge of Lyons. It was a 1954 Pontiac bearing license tag No. PN 3811. It was a blue two-tone colored automobile with the left tail light out. After stopping the vehicle Sheriff Cline determined that the appellant was driving the automobile, and the occupant in the front seat with him was Jesse Wyatt.

The sheriff testified concerning the appellant's arrest as follows:

"Q. After you stopped the car, what, if anything did the defendant do?

"A. Well, Mr. Wood stepped out, or the defendant stepped out of the vehicle, and Mr. Wyatt stayed in the vehicle, and Mr. — the defendant was out of the car actually before I was out of the police car. He asked me what was going on, and I said there was a matter we had to investigate about some checks, and he says, 'I don't know anything about any checks,' and about that time the city officer, Mr. Samuels, came up, and I directed the defendant to stay within the vicinity of the car, and to keep his hands where I could see them; and I directed Mr. Samuels to make a search of the defendant, which he did so."

On cross examination the sheriff testified:

"Q. Sheriff, when you stopped the defendant and Mr. Wyatt, did you place them under arrest at that time?

"A. Yes, sir.

"Q. What did you place them under arrest for?

"A. Well, the defendant asked what this was all about, and I said in connection with some checks that was reportedly stolen in Great Bend, and it was not so much the arrest by taking hold of the person, but it was implied by the words and gestures, that he was under arrest.

"Q. In other words, the arrest was actually for investigation purposes?

"A. Yes, sir."

The sheriff was present when Samuels searched the appellant, and Samuels took a check from the left shirt pocket of the appellant—a check of the Dr. Pepper Bottling Company in Great Bend. Samuels gave the check to the sheriff at that time. He made notes as to the number of the check, the amount ($113.20), and to whom it was made payable. The state's exhibit No. 4 is the identical check taken from the appellant's shirt pocket.

On redirect examination Sheriff Cline testified:

"Q. Would you have arrested the defendant in this matter whether or not you found the check in his possession?

"A. Yes, sir, on the basis of the information passed, the car and the information from the other agency that there had been something like this perpetrated, I would have, yes, sir.

"Q. Sheriff, was there anything else in the defendant's possession when he was booked in at the jail?

"A. He was booked in the jail, he was relieved of his belongings, which was a purse, there was a pen involved, and to my recollection, that is all."

The state's exhibit No. 4 was admitted into evidence *without objection* by counsel for the appellant.

Sheriff Cline took the appellant from the point of apprehension to the Rice County jail in the sheriff's automobile.

The sheriff identified the state's exhibits 1, 2 and 3 as checks which were given to him by John Murphy of the Highway Patrol at the county jail on the evening in question.

Officer Samuels of the Lyons Police Department testified that Sheriff Cline stopped the Pontiac in question; that he searched the appellant and took the check (state's exhibit No. 4) from him and handed it to Sheriff Cline; also that he searched Mr. Wyatt and found nothing on him.

At approximately 6:30 p. m. on December 30, 1961, Trooper John Murphy of the Kansas Highway Patrol went on duty with another trooper. He was aware of a broadcast with reference to some checks that had been stolen from the Dr. Pepper Bottling Company in Great Bend, and of an attempt to pass such checks in the vicinity of Ellinwood. He had a description of the vehicle in question when he proceeded from Great Bend toward Ellinwood. As he approached the west edge of Ellinwood he heard the police radio broadcast to the effect that Sheriff Cline and one of the city officers from Lyons had stopped the automobile in question, and that they had apprehended two subjects in the automobile. Enroute to Lyons he stopped at Ellinwood to pick up Mr. Bieberle and took him from Ellinwood to Lyons to identify the person attempting to pass a check in his store.

When they arrived at Lyons between 7:30 and 8:00 p. m., they saw the subject automobile parked near the Lyons city limits. It was a 1954 Pontiac, two-tone blue, with license number PN 3811 and with the left tail light broken out. Trooper Murphy was in communication with Sheriff Cline regarding a search of the automobile. Sheriff Cline sent the keys out to him and Trooper Murphy drove it to the county jail. At the direction of Sheriff Cline he then searched the automobile looking for some of the checks taken from the Dr. Pepper Bottling Company. At the time the search was made, he understood the appellant had been arrested and placed in jail. He did not have a search warrant. During his search he found the state's exhibits 1, 2 and 3 (Dr. Pepper Bottling Company checks bearing numbers within the series stolen). Trooper Murphy testified that he made a thorough search of the automobile in question, and that he was searching for items connected with the burglary which had been committed in Great Bend. Under the right front seat he found one Dr. Pepper Bottling Company check that was made out, and under the floor mat on the right side he found a number of check blanks also from the

Dr. Pepper Bottling Company of Great Bend. He did not find anything in the trunk of the automobile, nor did he find anything else in the automobile.

Counsel for the appellant objected to the introduction of state's exhibits 1, 2 and 3 as having been obtained by illegal search and seizure. He argued:

". . . Now, at the time of the search, there was only a supposition of an arrest, and really, the supposition was in regard to an alleged burglary. Now, I think that the evidence was clear, here, from the sheriff, that the alleged arrest was for the investigation of the forged check that was found in the defendant's own possession, and was not because of an alleged burglary. So, for that reason, we move the court to suppress all evidence that was obtained through the illegal search and seizure."

In his brief the appellant contends he has been denied due process of law under the Fourteenth Amendment of the United States Constitution, and cites *Mapp v. Ohio,* 367 U. S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684; and *Henry v. United States,* 361 U. S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168.

Prior to *Mapp v. Ohio,* supra, the United States Supreme Court held that in a prosecution in a state court for a state crime, the Fourteenth Amendment to the Federal Constitution did not forbid the admission of evidence obtained by an unreasonable search and seizure. (*Wolfe v. Colorado,* 338 U. S. 25, 93 L. Ed. 1782, 69 S. Ct. 1359.) Since 1914, however, in a federal prosecution the Fourth Amendment to the Federal Constitution barred the use of evidence secured through an illegal search and seizure, and convictions by means of unlawful seizures and enforced confessions found no sanction in the judgments of the courts. *Weeks v. United States,* 232 U. S. 383, 58 L. Ed. 652, 34 S. Ct. 341.) This simply meant that such evidence "shall not be used at all." (*Silverthorne Lumber Co. v. United States,* 251 U. S. 385, 392, 64 L. Ed. 319, 40 S. Ct. 182.) *This is known as the exclusionary rule.*

In *Mapp v. Ohio,* supra, the exclusionary rule was imposed upon the states as an essential ingredient of the right of a defendant under the due process clause of the Fourteenth Amendment of the United States Constitution. The court said:

". . . Today we once again examine *Wolf's* constitutional documentation of the right to privacy free from unreasonable state intrusion, and, after its dozen years on our books, are led by it to close the only courtroom door remaining open to evidence secured by official lawlessness in flagrant abuse of that basic right, reserved to all persons as a specific guarantee against that very

same unlawful conduct. We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." (pp. 654, 655.)

It is significant to note in *Mapp v. Ohio*, supra, the Supreme Court of Ohio found the conviction of the appellant was valid though based primarily upon the introduction in evidence of lewd and lascivious books and pictures *unlawfully seized during an unlawful search of the appellant's home.* This was officially stated in the syllabus to its opinion. State officers there, insofar as the record discloses, had no search warrant and in a highhanded manner broke into the hall leading to the *apartment* of Miss Mapp. The officers went to Miss Mapp's residence in Cleveland pursuant to information that a person was hiding out in the *home,* who was wanted for questioning in connection with a recent bombing, and that there was a large amount of policy paraphernalia *being hidden in the home.* A struggle ensued following which Miss Mapp was handcuffed and forcibly taken upstairs to her bedroom where the officers searched a dresser, a chest of drawers, a closet and some suitcases. The search spread to the rest of the second floor, including the child's bedroom, the living room, the kitchen and a dinette. In the basement of the building they found a trunk which they also searched, and the obscene materials, for the possession of which Miss Mapp was ultimately convicted, were discovered in the course of that widespread search.

In *Henry v. United States,* supra, the issue was whether there was *probable cause for the arrest* leading to the search that produced the evidence upon which the conviction was founded. There a theft from an interstate shipment of whiskey was made at a terminal in Chicago. The next day two F. B. I. agents investigated. The agents had been given information of an undisclosed nature concerning the implication of Pierotti with interstate shipments. But, so far as the record discloses, the informant never went so far as to tell the agents he suspected Pierotti of any such thefts. They saw the petitioner and Pierotti walk across a street from a tavern and get into an automobile. The agents followed the car, saw it enter an alley and stop. Petitioner got out of the car, entered a gangway leading to residential premises, and returned in a few minutes with some cartons. He placed them in the car and he and Pierotti drove off. The agents were unable to follow the car, but later they found it parked at the same place near the tavern. Shortly they saw the petitioner and Pierotti leave the tavern, get

into the car and drive off. The car stopped in the same alley as before; petitioner entered the same gangway and returned with more cartons. The agents observed this transaction from a distance of some three hundred feet and could not determine the size, number or contents of the cartons. As the car drove off the agents followed it and finally, when they met it going in the opposite direction, waved it to a stop. The agents searched the car, placed the cartons in their car, and took the merchandise and the petitioner and Pierotti to their office and held them for about two hours when the agents learned that the cartons contained stolen radios. The men were then placed under formal arrest.

The prosecution conceded, and the court viewed the facts to be, that the arrest took place when the federal agents stopped the car.

The court in its opinion recognized that while evidence required to establish guilt was not necessary to effect an arrest, good faith on the part of the arresting officers was not enough. The court said the command of the Fourth Amendment was that no warrants for either searches or arrests shall issue except upon *probable cause*, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. Common rumor or report, suspicion, or even strong reason to suspect were not adequate to support a warrant for arrest. Probable cause was said to exist if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed. (*Stacey v. Emery,* 97 U. S. 642, 645, 24 L. Ed. 1035; *Director General v. Kastenbaum,* 263 U. S. 25, 28, 68 L. Ed. 146, 44 S. Ct. 52; and *Giordenello v. United States,* 357 U. S. 480, 486, 2 L. Ed. 2d 1503, 78 S. Ct. 1245.) It held upon the facts presented that the officers *had no reasonable cause to believe that a crime had been committed at or before the time of the arrest.* The fact that contraband was afterwards discovered was not enough. An arrest is not justified by what the subsequent search discloses. While the court recognized that *Carroll v. United States,* 267 U. S. 132, 69 L. Ed. 543, 45 S. Ct. 280, liberalized the rule governing searches when a moving vehicle was involved, it was said *Carroll* merely relaxed the requirement for a warrant on the grounds of practicality, but did not dispense with the need for probable cause.

In *Carroll* it was said if the officer acts with probable cause, he is protected even though it turns out that the citizen is innocent, and while a search without a warrant is, within limits, permissible

if incident to a lawful arrest, if an arrest without a warrant is to support an incidental search, it must be made with probable cause.

Section 15 of the Bill of Rights to the Kansas Constitution provides:

"The right of the people to be secure in their persons and property against unreasonable searches and seizures, shall be inviolate; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons or property to be seized."

The Fourteenth Amendment of the Federal Constitution, as extended by the United States Supreme Court in *Mapp v. Ohio*, supra, to protect citizens of the United States from unreasonable searches and seizures by state officers, does not go beyond the prohibition in our own constitution as above quoted. In other words, the command of the Fourth Amendment in the Federal Constitution to federal officers is identical to the command of Section 15 of the Kansas Bill of Rights to law enforcement officers in Kansas.

Turning to the facts in the case at bar, it is apparent radio communications between the various law enforcement agencies of Great Bend, Ellinwood and Lyons informed the various officers involved that *the crime of burglary had been committed at Great Bend, Kansas, and that certain checks of the Dr. Pepper Bottling Company in Great Bend had been stolen together with a check protector machine and a typewriter.* The very nature of the items stolen during the burglary suggests, without question, the master plan or scheme of the culprit or culprits—an intention to forge instruments on the blank company forms stolen in the hope that such forged instruments would appear authentic to their unsuspecting victims and thus facilitate passing them in exchange for money.

Sheriff Cline, therefore, upon receipt of information through a law enforcement agency that an occupant in the subject vehicle had tried to pass a check in Ellinwood, which was reportedly stolen in the course of a burglary in Great Bend from the Dr. Pepper Bottling Company establishment, had *probable cause* to arrest the appellant when he stopped the subject vehicle. Two felonies had in fact been committed, and the sheriff had reasonable grounds to believe the appellant committed the offenses. After the initial felonies of burglary and larceny had been committed, the subsequent offenses were merely a sequence of the events which

normally would be expected to follow—all were a part of the master plan or scheme of criminal endeavor.

On the record here presented (consisting of a complete transcript supplied by the appellant) we hold the information communicated to Sheriff Cline through a law enforcement agency from Ellinwood was sufficient to warrant a prudent man in believing that felonious acts had been committed, and that there were reasonable grounds to believe the appellant committed such crimes.

On the record presented we further hold the arrest of the appellant was accomplished when the sheriff stopped the subject vehicle and gave directions to the appellant to stay within the vicinity of the automobile and to keep his hands where the sheriff could see them. This was prior to a search of the appellant or the subject vehicle which was under his control. The sheriff in his testimony considered the arrest to have been made at that time, and so did the trial court.

The function of the law enforcement officer extends beyond the mere arrest of the offender. It is not only the officer's job to bring the arrested person to justice, but to produce for the court the articles and documents that may assist in determining the question of guilt or innocence. Thus, the law grants to the officer certain powers to search the person and the automobile in his control, if incident to a lawful arrest (either with or without a warrant), and to seize and retain those things that have value as evidence. This power is a necessary part of the process of criminal investigation and prosecution. In this respect it is well established that an officer making a lawful arrest has authority to search the person of his prisoner, even against the prisoner's will, and to take from him any dangerous weapons and other articles that he reasonably may deem necessary to his own or the public safety, or for the safekeeping of the prisoner, as well as the instruments and fruits of the crime and such other articles as may be of use as evidence on the trial. (See, 4 Am. Jur., Arrest, § 68, and cases cited.)

Where a lawful arrest is made and the person arrested is the driver or in control of an automobile, the automobile may be searched as an incident of the arrest. This includes the whole interior of the automobile and the trunk. The keys may be taken from him to get into a locked trunk. The search of the interior of the automobile and the seizure of evidence, if incident to a lawful arrest, is reasonable, and whatever is found upon his person or in his control, which it is unlawful for him to have, and which may

be used to prove the offense, may be seized and held as evidence in the prosecution. (See, *Weeks v. United States,* 232 U. S. 383, 392, 58 L. Ed. 652, 34 S. Ct. 341; *Carroll v. United States,* 267 U. S. 132, 158, 69 L. Ed. 543, 45 S. Ct. 280; and *State v. Carr,* 114 Kan. 442, 218 Pac. 1007.)

While a search of an automobile might be expected to take place when and where the arrest occurs, there seems to be no harm in first removing the automobile to the station where it can be more thoroughly and accurately searched, even though some time must elapse between the arrest and the search.

We hold under the facts and circumstances presented by the record herein the search of the appellant and the automobile under his control was incident to a lawful arrest and, therefore, reasonable. The seizure of the stolen checks found in the course of the search under these circumstances was proper.

The appellant did not take the stand to testify in his own behalf, but he did call a handwriting expert from the Kansas Bureau of Investigation to testify. The expert was unable to positively say from known specimens of the appellant's handwriting that he forged the name of John B. Weltmer on the state's exhibits No. 3 and No. 4. He testified there were dissimilarities. There was evidence on behalf of the appellant that Jesse Wyatt signed the name of John B. Weltmer to these checks. Accordingly, the appellant argues in his brief that it was Wyatt who committed the forgery and uttered the checks.

Without objection by counsel for the appellant the trial court instructed that under the laws of Kansas "any one who counsels, aids, or abets in the commission of an offense may be charged, tried, and convicted and punished in the same manner as if he were a principal" (see, G. S. 1949, 62-1016) and that "Under these provisions of law, all participants in crime are equally guilty without regard to the extent of their participation."

The contentions of the appellant are therefore to no avail. The circumstantial evidence was sufficient for the jury to find the appellant guilty in the same manner as if he were the principal. He was charged and tried as a principal.

The appellant contends that hearsay evidence was used as circumstantial evidence and complains of the circumstantial evidence instruction given by the trial court. Nowhere does the appellant direct the court's attention to any ruling of the trial court

admitting hearsay evidence over objection. We interpret the appellant's contention to be a complaint that the state relied in part upon the circumstantial evidence in the proof of its case.

The circumstantial evidence instruction given has been carefully examined, and it is in accordance with the circumstantial evidence instruction usually given in criminal cases. It is found to correctly state the law. It has been held in criminal prosecutions that any of the essential elements of the crime charged may be proved by circumstantial evidence. (*State v. Dill*, 182 Kan. 174, 319 P. 2d 172, and cases cited therein.)

The trial court instructed the jury that the state had introduced evidence tending to prove the appellant, shortly after the alleged time the property in question was stolen, had possession of a part of the property alleged to be stolen—certain printed checks. It further instructed the jury "that the possession of stolen property recently after it is stolen is prima facie evidence of guilt, and throws upon the possessor the burden of explaining the possession, and if unexplained, may be sufficient of itself to warrant a conviction." The jury was instructed to decide from all the facts and circumstances proved upon the trial whether or not the appellant did have possession of the printed checks belonging to the Dr. Pepper Bottling Company, and whether said property in possession of the appellant was stolen from the Dr. Pepper Bottling Company.

Objection was made to this instruction on the ground that it shifted the burden of proof to the appellant. This contention is without merit. The instruction properly stated the law of Kansas, and, when read in connection with other instructions concerning the burden of proof, the trial court did not by its instructions shift the burden of proof to the appellant. This was emphasized by an instruction concerning the burden of proof in a criminal action, and by a further instruction concerning the presumption of innocence concerning an accused, which was said to continue until it had been overcome by evidence which established his guilt to the satisfaction of the jurors beyond a reasonable doubt.

The appellant contends the criminal statutes pursuant to which he was charged in this case were void as having been enacted by a "*de facto* malapportioned Legislature," all contrary to Article 10, Section 2 of the Kansas Constitution. This argument was advanced in *State v. Latham & York*, 190 Kan. 411, 426, 375 P. 2d 788, and held to be without merit for the reasons and upon the authorities therein cited.

The appellant argues the circumstantial evidence presented on behalf of the state fails to prove that the burglary was committed in the nighttime.

Assuming this to be true, the transcript does not disclose that the point was raised in the trial court, nor did the appellant or his counsel request an instruction on burglary in the third degree (daytime) pursuant to G. S. 1949, 21-521. Under these circumstances, this point is not here for review.

The appellant contends it was improper to sentence him pursuant to the Habitual Criminal Act. (G. S. 1949, 21-107a.)

Several attacks are made upon this statute. The ground that the legislature was malapportioned has heretofore been answered. Another ground that the statute is unconstitutional has been answered to the contrary by this court on numerous occasions and is without merit. The next point urged by the appellant is that the statute has been repealed by implication by the Postconviction Procedures Act (now appearing as G. S. 1961 Supp., Ch. 62, Art. 22).

The provisions of G. S. 1961 Supp., 62-2239, authorizing a trial court in its discretion to fix a minimum term of imprisonment, which shall in no case exceed the minimum term prescribed by law or one-third of the maximum term provided by law for the offense for which the defendant was convicted, or seven years, whichever is less, was before this court in State v. O'Connor, 186 Kan. 718, 353 P. 2d 214. It was there held the foregoing provision conflicts to such an extent with the provisions of the first paragraph of the section, as well as those of the crimes act (G. S. 1949, Ch. 21), that it was void, and that it was so vague and indefinite as to be judicially unadministrative. The remarks of the O'Connor case were extended in State v. Lewis, 187 Kan. 221, 356 P. 2d 845. There the appellant's contention suggested a construction of the language in 62-2239, supra, that would in effect repeal the Habitual Criminal Act, and it was said the legislature has not directly done so. This was said to indicate an additional reason confirming the soundness of the O'Connor decision. The net result is that the Postconviction Procedures Act has not repealed the Habitual Criminal Act, either directly or by implication.

The appellant's sentence pursuant to the provisions of the Habitual Criminal Act is also attacked on the ground that the evidence of previous convictions was insufficient.

Thirteen days prior to the trial written notice was served upon the appellant by the state that it intended to request the court to sentence under the provisions of 21-107a, *supra,* if the appellant was convicted of any of the offenses charged. The statute was quoted in the notice for the information of the appellant, and the request was based upon prior convictions which were enumerated as follows:

"United States District Court, Reno, Nevada, on or about May 25, 1945, of the crime of Interstate Transportation of a Stolen Motor Vehicle; In the District Court of Oklahoma County, Oklahoma, on or about October 1, 1948, of the crime of Second Degree Forgery; In the District Court of Cherokee County, Kansas, on or about November 23, 1950, of the crime of Robbery in the First Degree; In the District Court of McPherson County, Kansas, on or about February 7, 1958, of the crimes of Forgery and Jail Break."

After the jury found the appellant guilty of the five counts heretofore indicated, three exhibits were introduced to the court as follows: (1) A certified copy of the journal entry of the appellant's conviction for the crime of first degree robbery in the district court of Cherokee County, Kansas; (2) a certified copy of the judgment and sentence from the district court of McPherson County, Kansas, for the offense of jail break; and (3) a duly authenticated copy of the information and judgment and sentence from the district court of Oklahoma County, Oklahoma, for the crime of second degree forgery. The first two were objected to by counsel for the appellant on the ground they were not authenticated. In clarifying his position he pointed out they were not authenticated according to Act of Congress. The objection was overruled and the appellant sentenced pursuant to the Habitual Criminal Act.

As to the offenses committed in Kansas certification by the clerk of the district court was sufficient. Under the circumstances the trial court had sufficient evidence to authorize sentence on the ground that the appellant had been convicted a third time of felony. (See, G. S. 1949, 60-2853 and 60-2854.)

It is argued the sentence of thirty years imposed exceeds the statutory provision. This contention is without merit. Under G. S. 1949, 21-109, the provision for a minimum sentence of not less than fifteen years in the Habitual Criminal Act (21-107a, *supra*) is construed to allow sentence for life or for any number of years not less than the prescribed minimum. (*Fitzgerald v. Amrine,* 154 Kan. 209, 117 P. 2d 582; and *State v. Fountaine,* 188 Kan. 190, 360 P. 2d 1119.)

The appellant next contends the trial court erred in overruling his motion for a new trial based upon the ground of newly discovered evidence. This evidence consisted primarily of an effort to show the 1954 Pontiac in question was not exclusively within the control of the appellant on the night of December 30, 1961, and goes to an attempt to establish alibi. Nowhere in the record is it disclosed that the appellant relied upon alibi as a defense in the trial of the case. This situation was presented in reverse in *State v. Cooper,* 190 Kan. 101, 372 P. 2d 289. The court held:

"In a criminal action which is defended by the accused on the theory of alibi, an inconsistent defense presented at the hearing on the motion for a new trial on the ground of newly discovered evidence is unavailing, all as more particularly set forth in the opinion." (Syl. ¶ 4.)

Furthermore, there is no showing that this evidence could not have been procured by the exercise of reasonable diligence in time for the trial of the action, and it was within the power of discretion of the trial court to overrule the motion for a new trial on the ground of newly discovered evidence. (*State v. Rowland,* 176 Kan 203, 270 P. 2d 211.)

In addition to the evidence of the state heretofore presented other witnesses were called to establish the chain of possession concerning the various checks introduced in evidence. In defense Jesse Wyatt was called to testify, and his efforts to explain the situation and the circumstances did little more than to convince the jury that he and the appellant were closely associated and implicated in the offenses for which the appellant was charged. The appellant did not take the stand to testify, and the trial court properly instructed the jury with respect to the appellant's failure to testify.

There was substantial competent evidence to support the verdict rendered by the jury and, it cannot, therefore, be disturbed on the ground that it was based on insufficient evidence, or that it was contrary to the evidence. (*State v. Osburn,* 171 Kan. 330, 232 P. 2d 451.)

The judgment of the lower court is affirmed.